IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SCOTT GRAUMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES, LLC,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Scott Grauman ("Plaintiff"), through his undersigned attorneys, Bursor & Fisher, P.A., brings this Class Action Complaint against Defendant Equifax Information Services, ("Defendant"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

## NATURE OF THE ACTION

1. This action seeks to redress Defendant Equifax Information Services, LLC's systemic failure to adopt reasonable procedures to ensure the accuracy of consumer credit reports.

2. Defendant is a leading personal credit reporting agencies in the nation. Consumers rely on Defendant to accurately report their credit scores because negative credit scores result in long lasting credit stigma which can reduce a consumer's ability to open new lines of credit, obtain housing, and negotiate payment plans for contractual obligations such as utilities and cell phone plans.

3. In 2020, the COVID-19 Pandemic spread across the globe, causing a massive economic crisis triggered by the enactment of Shelter-in-Place Orders across the United States.

As a result of the COVID-19 Pandemic, American unemployment swelled from 6.2 million to 20.5 million in the matter of months.[1]

4. As a result of this economic devastation, mortgage lenders have sought to ease the economic impact caused by the Pandemic. Mortgage lenders throughout the nation have been offering COVID-19 forbearance, deferral, or suspension of loan payments to home owners. As a result, home owners were not required to make payments on their mortgage pursuant to COVID-19 relief.

5. However, Defendant has failed to comply with its obligations under Federal and State Law by reporting non-payment pursuant to lender agreements as a negative remark on consumer's credit reports. This has resulted in lowering consumer credit scores and jeopardizing consumer's access to credit during a time of increasing financial insecurity. These and other harms could and should have been avoided had Defendant exercised even a modicum of reasonable care.

6. Plaintiff brings this putative class action on behalf of himself and all other similarly situated persons, and seeks order requiring Defendant to immediately halt and correct its unlawful practices and obtain relief on behalf of himself and thousands of other borrowers.

## JURISDICTION AND VENUE

7. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves violations of the Fair Credit Reporting Act, 15 US.C. § 1681 *et seq*.

8. Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District. Plaintiff Grauman is a citizen of New York, resides in this District, and suffered the consequences of Defendant's actions in this District.

---

[1] https://www.pewresearch.org/fact-tank/2020/06/11/unemployment-rose-higher-in-three-months-of-covid-19-than-it-did-in-two-years-of-the-great-recession/ (last accessed July 9, 2020).

## PARTIES

9. Plaintiff Grauman is a citizen of New York who resides in Roslyn, New York. Plaintiff Grauman's mortgage payments were suspended from April 15, 2020 through July 1, 2020. Plaintiff Grauman paid his monthly mortgage payments for April through July 1, 2020 in a timely manner. During this suspension period, Wells Fargo promised it would not report missed payments to the credit bureaus. On June 6, 2020, Mr. Grauman's credit score dropped by approximately 16 points from 832 to 816. This drop was attributed to the erroneous reporting of his mortgage suspension by Wells Fargo. On, or around, July 6, 2020, Wells Fargo removed any remark regarding the suspension of his mortgage. However, Defendant has not rectified Mr. Grauman's credit score, despite being informed that the remark by Wells Fargo contained false and patently inaccurate information regarding his credit history. Plaintiff was current on all mortgage payments prior to the imposition of the mortgage suspension by Wells Fargo. On January 25, 2021, Plaintiff's inaccurate consumer report was produced to Wells Fargo.

10. Defendant Equifax Information Services, LLC ("Equifax") is a foreign corporation with its principal place of business in Atlanta Georgia.

11. Defendant is a "consumer reporting agency" within the meaning of 15 U.S.C. § 1681a(p).

12. Defendant Equifax sells consumer reports ("credit reports") to creditors, landlords, employers, and others seeking to evaluate consumers for credit, housing, employment, and other purposes contemplated in the FCRA.

13. Defendant's credit reports are consumer reports under the FCRA, 15 U.S.C. 1681a(D).

# FACTS

14. In response to the COVID-19 Pandemic (the "Pandemic"), Wells Fargo offered more than 964,000 mortgagors short-term payment suspension for a three month period. As part of the terms of the short-term suspension, Wells Fargo agreed that it would not charge late fees or report additional missed payments to the credit bureaus:

> We know that this is a challenging time as you work to protect what matters most: your health and the health and safety of the people you care for. You let us know about a financial hardship you're facing. We want you to know that we're here to help.
>
> You may not know how you'll be affected by the spread of coronavirus (COVID-19), so we want to help by providing you with time to assess your situation. For this reason, we're providing the following short-term payment suspension for your account.
>
> **Your short-term payment suspension (forbearance)**
> This payment relief is an immediate payment suspension — a temporary pause of your loan payments for an initial three months. Unless you receive further relief, you'll need to resume your regular mortgage payment schedule beginning on July 1, 2020.
>
> During payment suspension:
> - We won't charge late fees or report additional missed payments to the credit bureaus.
> - If the account is past-due, we won't refer the account to foreclosure at this time.
>
> Please contact us if you need assistance but don't think this short-term payment suspension is right for you.

15. Wells Fargo unilaterally suspended payment on non-delinquent mortgage accounts without requiring borrower's consent. Wells Fargo engaged in a practice of placing accounts into forbearance when consumers sent a secure email or contacted Wells Fargo by phone regarding COVID-19 related hardship or requested a fee waiver – even if the customer did not explicitly request a forbearance. Wells Fargo also placed accounts into COVID-19 forbearance when consumers began, but did not complete requests for COVID-19 related hardships.

16. Given the mass economic impact caused by the Pandemic, it was common knowledge that mortgage lenders, and other creditors, were placing mortgages into suspension in response to the Pandemic and payment. However, rather than doing its due diligence, as

required by the FCRA, Defendant reported thousands of loans held by Wells Fargo for nonpayment. This resulted in thousands of borrowers suffering a decrease in their credit score, when no payment was due on those mortgages.

17. When Plaintiff Grauman procured his consumer report from Equifax on June 6th, the report Plaintiff received stated that his credit score had dropped by approximately 16 points. On July 25, 2020, a remark appeared stating that a remark by "Wells Fargo Home Mortgage" had been removed from the account, therefore notifying Defendant that the report contained a patent inaccuracy. Upon information and belief this remark improperly reported Plaintiff's mortgage as being in forbearance. However, Mr. Grauman's credit score did not adjust to reflect this correction.

18. Plaintiff's inaccurate consumer report was provided by Equifax to a third party, Wells Fargo, on January 25, 2021. This report started that Plaintiff's credit score was 797, indicating that Plaintiff's credit score was never rectified to reflect the removal of the Wells Fargo remark.

19. Equifax's reporting was patently inaccurate. Plaintiff's mortgage payment was suspended and Plaintiff was promised non-payment would not be reported to the credit bureau during the suspension period. Moreover, during this suspension, Plaintiff continued to pay his mortgage in a timely manner.

20. Plaintiff Grauman's consumer report creates a materially misleading impression regarding his creditworthiness because Plaintiff suffered a 16 point diminution in his credit score as a result of Defendant's credit scoring models failing to properly account for the fact that major creditors were suspending payments due to the COVID-19 Pandemic.

21. Defendant independently creates and reports consumer credit scores on consumer reports by aggregating the data in consumer reports and reducing it to a numerical score. Therefore, by incorporating inaccurate or false information, a credit score may itself be rendered inaccurate and misleading.

22. In many instances, creditors – and other users of credit reports use consumer credit scores alone as a basis for granting, or denying, credit, and even can impact how much a consumer may have to pay for credit. Often, there is no room for discretion. If a credit score is below a certain threshold, a consumer may be deemed a credit risk without a creditor separately reviewing the credit report at all. Therefore, a credit score alone can be factually inaccurate and misleading

23. Credit scoring models are algorithms which generate a numeric score based on data contained in a consumer's credit report. Based on the algorithm's specifications, certain credit events, such as payments, account closures, defaulted payments, and liens, can negatively or positively affect a consumer's credit score.

24. Credit scores are used by financial institutions, creditors, and other users of credit scores to evaluate consumers for credit, housing, insurance, employment, utilities, and numerous other purposes.

25. Defendant failed to adjust its credit scoring algorithm to account for relief provided to consumers for mortgages impacted by the Pandemic.

26. Rather than treating the suspension of borrowers' payment obligations as a score-neutral or score-positive event, the credit scoring algorithm used by Equifax treated the relief afforded to mortgagors as a negative event.

27. The credit scoring algorithm therefore caused a precipitous, sudden, and predictable drop in the credit scores of mortgage borrowers whose loans were held by Wells Fargo.

28. The drop was unjustified. Defendant had zero factual support for the drop in credit scores. The borrowers whose scores dropped had done nothing differently than they had in the past. If anything, these consumers were a better credit risk than they would have been if mortgage relief had never been offered.

29. As a direct and predictable result of the failure of Defendant to adjust its credit scoring model, thousands of Americans' credit scores dropped as soon as the credit reporting agencies began to report mortgagors' loans for non-payment due to authorized suspensions.

30. Had Defendant's credit scoring model been properly adjusted to account for COVID-19 loan relief, the model would have ensured that mortgagors with loans held by Wells Fargo would experience no change in their scores, or experience an increase in their scores.

31. In the realm of consumer debt and consumer reporting, a notation of non-payment, forbearance, interest accrual, or a lowered credit score is a scarlet letter. Nonpayment implies that the mortgagor is unable to meet the terms of the loan as originally agreed, and that the mortgagor has a diminished present capacity to make payments and will face those obligations on an ongoing basis in the future. Forbearance implies that the borrower is unable to meet the terms of the loan as originally agreed, and that the borrower has a diminished present capacity to make payments and will face those obligations on an ongoing basis in the future. Similarly, interest accrual indicates a reduction in borrowing capacity, increasing the amount due. Likewise, a low credit score indicates that a consumer is likely to default on a financial obligation, and therefore indicates a lack of creditworthiness.

32. The impact of Defendant's reporting of thousands of Wells Fargo mortgagors for non-payments, when Wells Fargo was not supposed to report non-payment due to COVID-19, was immediate, sweeping, and devastating.

33. For mortgages serviced by Wells Fargo, mortgagor's credit scores dropped immediately and significantly.

34. Defendant's automated credit scoring treated the Wells Fargo suspensions as derogatory items that negatively impact the consumers' creditworthiness.

35. Defendant's conduct was willful and reckless.

36. With COVID-19 having a widespread impact on borrowers, numerous companies, from student loan servicers to mortgage lenders, have offered payment suspensions on loans.

37. Even cursory attention to the information lenders were reporting should have alerted Defendant to the gross and sweeping nature of its misreporting, and the devastating and predictable impact its erroneous reporting would have.

38. Rather than implementing reasonable procedures to ensure they would not compound the financial impact of COVID-19 on thousands of Americans, Defendant instead continued with business as usual, relying on antiquated systems and automated processes which failed to account for changes made by financial institutions in response to COVID-19.

39. Defendant had a myriad of existing options available to it that would have allowed them to report mortgagors' loans in a fashion that would have preserved mortgagors' credit.

40. Defendant could have easily reported accurate credit information using existing tools and procedures. However, Defendant failed to do so.

41. Defendant should never have reported the nonpayment of Wells Fargo mortgages. In particular, once Wells Fargo caught the erroneous report, Defendant should have corrected credit scores to provide an accurate report.

42. Defendant knew, or should have known, that Wells Fargo was inaccurately reporting mortgagor payment history. Defendant failed to take appropriate steps to ensure that the mortgage information provided was accurate.

43. Further, Defendant not only misreported the status of Wells Fargo mortgages, it participated in incorporating those false reports into credit scores. Numerous consumers' credit scores dropped significantly, as soon as Defendant incorporated Wells Fargo's inaccurate reporting into its database.

44. A sudden drop thousands of credit reports relating to Wells Fargo's reports should have also alerted Defendant of its reporting errors. Yet, this clear signifier of erroneous reporting garnered no correction to its reporting.

45. Defendant's actions have effectively counteracted the relief offered to Wells Fargo customers. Rather than improving mortgagors' financial status and their ability to acquire additional credit, Defendant's conduct has been to mortgagors' detriment.

46. As a result of these actions, Defendant violated the FCRA by failing to employ reasonable procedures to ensure maximum credit accuracy. *See* 15 U.S.C. § 1681e(b). Had Defendant properly reviewed the information Wells Fargo furnished to it, Defendant would have realized the information was inaccurate.

## CLASS ACTION ALLEGATIONS

55. Plaintiff seeks to represent a class defined as:

> All residents of the United States about whom Wells Fargo furnished credit information to Equifax pertaining to mortgages held in suspension due to the COVID-19 Pandemic.

47. Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number are in the thousands. The precise number of Class Members and their identities are unknown to Plaintiff at this time but may be determined through discovery. Class Members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

48. Common questions of law and fact exist as to all Class Members and predominate over questions affecting only individual Class Members. Common legal and factual questions include, but are not limited to: (a) whether Defendant violated the FCRA by failing to follow reasonable procedures to assure maximum possible consumer report accuracy; (b) whether any such violations were willful; and(c) the proper measure of damages.

49. The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's failure to follow reasonable procedures to ensure maximum possible consumer report accuracy.

50. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class Members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of Class Members will be fairly and adequately protected by Plaintiff and his counsel.

51. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class Members. Each individual Class Member may lack the

resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I
## 15 U.S.C. § 1681e(b)
## (On Behalf Of The Class)

52. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

53. Defendant failed to comply with 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the records it reported.

54. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq., to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

55. The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy,

because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information. The FCRA also imposes duties on the sources that provide credit information to credit agencies, called "furnishers."

56. Defendant is required to use reasonable procedures to ensure maximum possible accuracy when preparing consumer disclosures and willfully and/or negligently failed to do so.

57. Defendant acted in negligent, deliberate, and reckless disregard of its obligations and rights to Plaintiff and Class Members under 15 U.S.C. § 1681e(b). Defendant's negligent and willful conduct is reflect by, *inter alia*, the following:

   a. Defendant inaccurately reported the status of Plaintiff's and other Class Members' Wells Fargo home mortgages;

   b. After learning about the inaccurate information furnished by Wells Fargo, Defendant continued to include inaccurate information in its reports, including, but not limited to, in the credit score itself, rather than correcting the inaccurate reports; and

   c. By adopting a policy of failing to review information from its furnisher, and of failure to retract such information, Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

58. Plaintiff and Class Members suffered damages caused by Defendant, including ongoing credit and other financial harm.

59. Plaintiff and the Class are entitled to actual damages or statutory damages of not less than $1000 and not more than $1000 per individual for this violation. Plaintiff and the Class are also entitled to punitive damages, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the other Class Members respectfully request that the Court:

A.  Certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.  Award damages, including compensatory, statutory, actual, and punitive damages to Plaintiff and the Class in an amount to be determined at trial;

C.  Award Plaintiff and the Class their expenses and costs of the suit, pre-judgment interest, post-judgment interest, and reasonable attorneys' fees; and

D.  Grant any and all such other relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

Dated: November 8, 2021

**BURSOR & FISHER, P.A.**

By:  */s/ Philip L. Fraietta*

Philip L. Fraietta
888 Seventh Avenue
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Brittany S. Scott (*Pro Hac Vice* Forthcoming)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: bscott@bursor.com

**Milberg Coleman Bryson Phillips Grossman PLLC**
Nick Suciu III (*Pro Hac Vice* Forthcoming)
6905 Telegraph Rd. Suite 115
Bloomfield Hills, MI 48301
Telephone: (313) 303-3472
E-Mail: nsuciu@milberg.com

*Attorneys for Plaintiff*

*Attorneys for Plaintiff*